UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHRISTINE DAVIS,

                    Plaintiff,

          -v.-

AMERICAN BROADCASTING COMPANY (ABC);
DELICIOUS NON-SEQUITUR PRODUCTIONS;
BLUE PARK PRODUCTIONS; SHAVON SULLIVAN
WRIGHT; CHERISSE PARKS; JUSTIN HALPERN;
PATRICK SCHUMACKER; and QUINTA BRUNSON

                    Defendants.

---

22 Civ. 5944 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

     Plaintiff Christine Davis owns the registered copyright to the treatment

for a proposed television series chronicling the exploits of public-school

teachers, entitled *This School Year* (the "Work"), based on Plaintiff's own

experiences as a teacher in the New York City public school system.  Plaintiff

now presses a single claim under the Copyright Act of 1976, 17 U.S.C. ch. 1-

15, alleging that various parties infringed upon her Work in connection with

the production and release of the popular television series *Abbott Elementary*, a

comedy set in a public elementary school located in Philadelphia.  In

particular, Plaintiff sues those responsible for the creation and dissemination

of the series — Defendants Quinta Brunson, Justin Halpern, Patrick

Schumacker, Delicious Non-Sequitur Productions, LLC, and the American

Broadcasting Company (together, the "Abbott Defendants") — as well as those

responsible for allegedly providing Plaintiff's Work to the Abbott Defendants,

namely Defendants Shavon Sullivan Wright, Blue Park Productions, LLC

("BPP," and together with Wright, the "BPP Defendants"), and Cherisse Parks (together with the BPP and Abbott Defendants, "Defendants").

Now before the Court are the three separate motions to dismiss of the Abbott Defendants, Parks, and the BPP Defendants. The Abbott Defendants move under Federal Rule of Civil Procedure 12(b)(6), maintaining that *Abbott Elementary* bears no substantial similarity to *This School Year*, and thus that Plaintiff cannot plausibly allege that the Abbott Defendants engaged in any illegal copying, a necessary element of her claim. Parks moves under Rules 12(b)(2) and 12(b)(6), incorporating the Abbott Defendants' arguments regarding the lack of any substantial similarity, and further maintaining that Plaintiff has not plausibly alleged facts to support the Court's assertion of personal jurisdiction over her. Not to be forgotten, the BPP Defendants move under Rules 12(b)(2) and 12(b)(6), incorporating both the Abbott Defendants' arguments on the merits and Parks's arguments concerning jurisdiction, and adding their position that Plaintiff has not pleaded any actionable theory of liability against the BPP Defendants.

For the reasons set forth herein, the Court denies the motions to dismiss for lack of personal jurisdiction of Parks and the BPP Defendants, but grants all Defendants' broader motions to dismiss for failure to state a claim.

## BACKGROUND[1]

### A.   Factual Background

#### 1.   The Parties

Plaintiff is a resident of New York, New York, and the author of a
television treatment titled *This School Year*, for which work she also holds the
registered copyright.  (SAC ¶¶ 2, 9).

Defendants Quinta Brunson, Justin Halpern, and Patrick Schumacker
are residents of California.  (SAC ¶¶ 17-19).  Brunson is the writer, executive
producer, and star of *Abbott Elementary*, while Halpern and Schumacker serve
as the series' executive producers.  (*Id.*; Abbott Br. 3).

Defendant Delicious Non-Sequitur Productions, LLC ("Delicious Non-
Sequitur") is registered as a Foreign Limited Liability Company in Delaware
(SAC ¶¶ 11), while Defendant American Broadcasting Company ("ABC") is a
New York-based corporation and business entity registered with the New York

---

[1]    This Opinion draws its facts from the Second Amended Complaint ("SAC" (Dkt. #56)),
the well-pleaded allegations of which are taken as true on this motion, *see Ashcroft* v.
*Iqbal*, 556 U.S. 662, 678 (2009), and the exhibits attached thereto ("SAC, Ex. [ ]").  The
Court also relies, as appropriate, on Exhibit 1 to the Declaration of Rachel Strom in
support of the Abbott Defendants' motion to dismiss (Dkt. #66 ("Strom Decl.")), which
exhibit contains the entirety of Season 1 of *Abbott Elementary*.  *See Effie Film, LLC* v.
*Pomerance*, 909 F. Supp. 2d 273, 298 (S.D.N.Y. 2012) ("It is well established that courts
may take judicial notice of the works at issue in a copyright case.").

For ease of reference, the Court refers to the Abbott Defendants' memorandum of law in
support of their motion to dismiss as "Abbott Br." (Dkt. #65); to Parks's memorandum
of law in support of her motion to dismiss as "Parks Br." (Dkt. #69); to Plaintiff's
consolidated memorandum of law in opposition to the Abbott Defendants' and Parks's
motions to dismiss as "Pl. Abbott Opp." (Dkt. #82); and to the Abbott Defendants' and
Parks's reply memoranda of law as "Abbott Reply" and "Parks Reply," respectively (Dkt.
#84 (Parks Reply), 85 (Abbott Reply)).  In a similar vein, the Court refers to the BPP
Defendants' memorandum of law in support of their motion to dismiss as "BPP Br."
(Dkt. #87); to Plaintiff's memorandum of law in opposition to the BPP Defendants'
motion to dismiss as "Pl. BPP Opp." (Dkt. #90); and to the BPP Defendants' reply
memorandum of law as "BPP Reply" (Dkt. #91).

Department of State (*id.* ¶ 10).  Delicious Non-Sequitur serves as the

production company for *Abbott Elementary*, and ABC produces, markets, and

broadcasts the series.  (Abbott Br. 3)

Defendants Shavon Sullivan Wright is a resident of New Jersey (SAC

¶ 15), and Defendant Cherisse Parks is a resident of Pennsylvania (*id.* ¶ 16).

Wright and Parks co-founded of Defendant Blue Park Productions, LLC, a

production company located in New Jersey.  (BPP Br. 10; *see* Dkt. #70

(Declaration of Cherisse Parks) ¶ 4).

### 2.    The Development of *This School Year*

Plaintiff is a rising Jamaican-American writer, actor, and performer in

New York City.  (SAC ¶ 27).  She is also a licensed New York City school

teacher and, at the time of the filing of this lawsuit, was entering her eighth

year of teaching in the New York City public school system.  (*Id.*).  Plaintiff

created *This School Year* in 2018, inspired by her personal experience in

teaching, as well as the veteran teaching experiences of her family members,

including her cousin, Camille Davis, after whom the protagonist of the Work is

named.  (*Id.* ¶¶ 28-33).[2]  Many of the elements, characters, plot lines, and

scenarios contained in *This School Year* are drawn directly from Plaintiff's daily

teaching experiences; her encounters with other teachers, school

administrators, and students; and her background as a step coach.  (*Id.* ¶¶ 31-

32).  Plaintiff registered *This School Year* with the United States Copyright

---

[2]     For clarity, the Court refers to Plaintiff Christine Davis as "Plaintiff," and to the
protagonist of *This School Year*, "Ms. Camille Davis" (SAC ¶ 29), as "Davis" or "Ms.
Davis."

Office on March 6, 2020, under Copyright Registration No. Pau004020233, and has also registered the Work with the Writers Guild of America.  (*Id.* ¶¶ 33-35).

In or about mid-June through July 2020, Plaintiff contacted Wright and Parks at Blue Park Productions, seeking a production company to assist Plaintiff in bringing *This School Year* to market.  (SAC ¶ 48).  Plaintiff was excited about the mission statement of Wright, Parks, and BPP to "[e]ncourage and train the next generation of black female identifying creatives."  (*Id.* ¶¶ 49-50).  Indeed, BPP marketed itself as an "incubator and facilitator for talented black women to sell their original ideas and series to television networks and streaming platforms."  (*Id.*).  Plaintiff alleges that Parks and Wright held themselves out to Plaintiff as professional producers with substantial experience programming for network television and "'connections' with ABC and Hulu," the latter being the streaming platform on which *Abbott Elementary* ultimately aired.  (*Id.* ¶¶ 51-52).  It was Plaintiff's impression, based on those interactions, that Parks and Wright, through BPP, would work with Plaintiff to develop *This School Year* into a television show.  (*Id.* ¶ 52).

To that end, on June 15, 2020, Wright sent Plaintiff a Non-Disclosure Agreement (the "BPP NDA"), which agreement Plaintiff duly signed and returned that same day.  (SAC ¶¶ 53-54).  Thereafter, Plaintiff emailed Wright a copy of her script for *This School Year* and an accompanying "story bible."  (*Id.* ¶ 55).  Plaintiff further emailed BPP updates to her script and story ideas for episodes on June 30, 2022.  (*Id.* ¶ 59).

Roughly one month after providing her original submission, on July 12, 2020, Plaintiff met via Zoom with Parks and Wright to discuss her script and story idea.  (SAC ¶¶ 60-61).  In this meeting, Parks and Wright reiterated their excitement regarding Plaintiff's script and story idea for *This School Year*, "told Plaintiff they would be able to present her work to noteworthy television outlets, including HULU, ABC, and others," and repeatedly expressed that both studios were looking for "Black, female-led comedies."  (*Id.* ¶¶ 62-64).  Accordingly, Wright and Parks "gave Plaintiff 'notes' on the script," and promised a subsequent meeting after Plaintiff incorporated their notes and recirculated a revised script, further urging Plaintiff to do so quickly to allow for BPP's presentation of Plaintiff's idea during the upcoming pitch season.  (*Id.* ¶¶ 65-66).

Plaintiff thereafter diligently incorporated Wright's and Parks's notes into her script and sent the revised script back to BPP.  (SAC ¶¶ 67-68).  Unfortunately, however, Plaintiff never heard back from Wright or Parks; to this day, neither individual has responded to Plaintiff's revised submission.  (*Id.* ¶¶ 69-70).  Instead, upon information and belief, Plaintiff alleges that Wright, Parks, and BPP "took Plaintiff's script and storybook and presented [*This School Year*] to their 'connections' at Hulu, ABC[,] and others," without Plaintiff's notice or consent.  (*Id.* ¶ 71).

### 3. The Development of *Abbott Elementary*

*Abbott Elementary* grew out of Brunson's pitch of a concept, originally titled *Harrity Elementary*, to ABC in September 2020.  (SAC ¶ 76).  At that time,

Brunson had apparently only developed a pitch document, and did not have a pilot episode to support her original pitch to ABC. (*Id.* ¶¶ 77-78). Nonetheless, in that same month, "ABC committed to a 'put pilot'" for what was to become *Abbott Elementary*. (*Id.* ¶ 72). A few months later, in February 2021, ABC gave Brunson's project an official pilot order and pre-production began, followed by production of the pilot episode. (*Id.* ¶ 73). In May 2021, ABC ordered a full season of the project (*id.* ¶ 74), and on August 16, 2021, Delicious Non-Sequitur and ABC commenced full production of *Abbott Elementary* (*id.* ¶ 75).

### 4. Overview of Both Works

For the benefit of the record, the Court provides a brief synopsis of the works at issue in this case before delving into the minutiae in its subsequent analysis. *See Williams* v. *Crichton*, 84 F.3d 581, 583 (2d Cir. 1996) (observing that the court's "determination of substantial similarity requires a detailed examination of the works themselves" (internal quotation marks omitted)). The Court presumes broader familiarity with Plaintiff's Work, *i.e.*, the underlying script for *This School Year* (SAC, Ex. J ("TSY")); Brunson's script for the pilot of *Abbott Elementary*, then-titled *Harrity Elementary* (SAC, Ex. K ("AE")); and the entire first season of *Abbott Elementary* (Strom Decl., Ex. 1).

#### a. *This School Year*

*This School Year* is a "mockumentary"-style workplace comedy set in New York City Public School 311. (*See generally* TSY). The episode begins a few days before the start of a new school year, and follows Camille Davis, the protagonist and a teacher in her second year, as she prepares for the year to

come. (*See generally id.*).  The show opens on Davis, alone in her classroom, banging her head against a book repeatedly and expressing trepidation about the upcoming school year.  (*Id.* at 1).  She is interrupted by two colleagues, Mr. West and Mr. Ryan, and the trio engage in a discussion about Davis's lack of enthusiasm for the upcoming year, as well as her need to get through the year so that she can receive tenure.  (*Id.* at 2-3).  Davis's outlook takes a further turn for the worse when she is informed that the school has a new principal, Ms. Lyons, who threatens to put Davis's chances of receiving tenure in jeopardy.  (*Id.* at 4-7).

The episode continues in a large meeting in the school's computer lab, at which meeting Principal Lyons — described as "[w]hite, middle-aged, [and] ditzy" (TSY 8) — addresses the school's teachers and staff (*id.* at 7-9).  Several other supporting characters are introduced to the viewer, including the school's no-nonsense assistant principal and teachers of various personality types, including a teacher who is half-asleep in the meeting, thanks to his tenured status; several veteran teachers, who view Principal Lyons with a degree of skepticism; and a younger, unhappy junior teacher.  (*Id.*).  In this meeting, Principal Lyons introduces the teachers and staff to the documentary crew, thereby enabling the show's mockumentary format.  (*Id.* at 9).

As the day progresses, Davis prepares her classroom and bulletin boards, interacts with a number of supporting characters in the school, and intermediates some mild tension between West and Ryan.  (*See generally* TSY 9-27).  The former is described as "Black, 24, tall, joyful, [and] sarcastic"

8

(*id.* at 1), and the latter as "White, 24, a know it all, enthusiastic[,] and really the type to get directly underneath your skin, even to the bones maybe" (*id.* at 2). Consistent with its mockumentary format, the episode is intercut with interviews of the various characters, including Lyons, Davis, and West, who each discuss their plans for the upcoming school year. (*Id.* at 9-10, 20-21, 25-26).

Later in the day, Davis is frustrated to learn that Principal Lyons has assigned her a new teaching subject at the last minute. (TSY 24). Davis is also irked when she is asked by Lyons to lead the school's culture committee, given her experience leading the school's step team. (*Id.* at 26-28). The episode closes with Davis returning to her classroom and slamming the door behind her, only to

> realize[] her desk looks different because it isn't her desk. She realizes she's been jacked, as if the day couldn't get any worse. She screams from the top of her lungs and throws a book at the blackboard. The sign "Welcome to this School Year" falls to the floor.

(TSY 28).

### b.   *Abbott Elementary*

*Abbott Elementary* is also a mockumentary-style workplace comedy. (*See generally* AE). At the center of the series is Janine Teagues ("Teagues"), a second-year teacher in the eponymous Philadelphia elementary school. (*See generally id.*). The series begins at the start of a new school year, and the pilot episode opens on Teagues, mid-lesson, in her second-grade classroom. (*Id.* at 1). Teagues gives an optimistic introductory monologue, intercut with scenes

of various teachers in their classrooms.  (*Id.* at 2-3).  The scene ends on a comedic note, with Teagues confiding in the viewer that she "finally feel[s] on top of things," all while a student is urinating on the classroom rug because the school toilets do not work.  (*Id.* at 3).  The loss of Teagues's classroom rug remains a recurring plot point throughout the episode, as Teagues attempts to secure resources to replace the rug from the school's principal, Ava Coleman. (*Id.* at 8-9, 14-15).  Coleman is described as "mid-40s, Black, aloof, loud, tone-deaf, [and] always want[ing] to be center of attention."  (*Id.* at 8).

In Act One of the pilot episode, the crew follows Teagues as she manages her students and interacts with Ms. Beeman, a veteran teacher who always maintains control of her classroom and whom Teagues greatly respects.  (AE 4-5).  The remaining cast of teachers is introduced shortly thereafter, in the teacher's lounge, where Teagues, Beeman, and Melissa Peterson,[3] another veteran second-grade teacher, poke fun at a junior teacher, Jacob Hill, who is described as "20s, white, painfully woke, a performative liberal cool nerd type." (*Id.* at 3, 6-8).  Principal Coleman also makes an appearance in the teacher's lounge, praising her own decision to invite the film crew into the school to "cover[] underfunded, poorly managed public schools in America," and brushing off Teagues's request to get a new rug for her classroom before exiting unfazed.  (*Id.* at 8-10).

---

[3]    This character is ultimately named Melissa Schemmenti in the final, produced version of *Abbott Elementary*.

Act Two of the pilot follows the teachers and students over the course of several school days and features the arrival of Gregory Wright, a "20s, Black, handsome, [and] a little self-serious" substitute teacher, brought in to replace a teacher who was fired after an altercation with a student.  (AE 13-20).  Viewers also learn that Teagues's scheme to get Coleman to put in an emergency budget request to fund Teagues's replacement rug has been successful.  (*Id.*). However, when Coleman is comically revealed to have used Teagues's emergency budget request to instead fund a new sign for the school (*id.* at 21-22), Teagues writes an email to the school's superintendent about Coleman's incompetence, realizing at the close of the act that the email was accidentally forwarded to Coleman herself (*id.* at 23-24).

Act Three, the pilot episode's final act, commences with a showdown between Teagues and Coleman at an all-staff meeting, in which Teagues publicly admits that she emailed the superintendent due to her frustration with Coleman's purchase of the sign, and "sadly storms out of the room." (AE 25-27).  Beeman, Peterson, Hill, and the other teachers walk out of the meeting to check on Teagues, who confesses that she is so driven to acquire a replacement rug because one of her students naps on her rug each day, as he "comes from a rough home … doesn't get much sleep[,] [and] [u]sed to fall asleep during [his] morning lesson."  (*Id.* at 28).  Teagues's compassion and motivation soften her more cynical colleagues, garnering their support in Teagues's quest for a new rug.  (*Id.* at 28-30).  Hijinks ensue, with Teagues, Peterson, Hill, and other teachers visiting the construction site of Philadelphia's

new football stadium, collecting stolen rugs diverted from installation in the stadium's VIP suites. (*Id.* at 30-32). The episode ends on a positive note, with the teachers enjoying their new rugs and Coleman reconciling with Teagues, as orchestrated by Peterson and Beeman. (*Id.* at 32-33).

**B.    Procedural History**

Plaintiff initiated this case with the filing of a complaint on July 12, 2022, alleging the aforementioned copyright claims against current Defendants as well as the Walt Disney Company. (Dkt. #1). Prior to the issuance of any summons, on October 4, 2022, Plaintiff filed her First Amended Complaint (the "FAC"), alleging the same claims, but modifying the list of defendants to clarify the name of Delicious Non-Sequitur Productions, LLC, and to add Halpern and Schumacker. (Dkt. #4).

On January 6, 2023, Disney and the Abbott Defendants jointly filed a pre-motion letter seeking to move to dismiss the FAC for failure to state a claim pursuant to Rule 12(b)(6), and the Court set a pre-motion conference for February 14, 2023, accordingly. (Dkt. #39, 40). On January 31, 2023, Parks filed her own pre-motion letter seeking to move to dismiss the FAC under Rules 12(b)(2), (5), and (6). Plaintiff filed her opposition to Disney's and the Abbott Defendants' pre-motion letter on February 7, 2023 (Dkt. #45), and her opposition to Parks's pre-motion letter on February 10, 2023 (Dkt. #47). As scheduled, the Court held a pre-motion conference on February 14, 2023, at which conference the Court (i) granted Plaintiff leave to file a second amended complaint and (ii) set a briefing schedule for the anticipated motions to

dismiss.  (February 14, 2023 Minute Entry; Dkt. #49 (Transcript of Proceedings)).

Plaintiff filed her Second Amended Complaint, the operative complaint in this matter, on April 12, 2023.  (Dkt. #56 (SAC)).  The Second Amended Complaint pressed the same copyright claims, but dropped Disney as a defendant.  (*Id.*).  Thereafter, the Abbott Defendants and Parks filed separate motions to dismiss on May 5, 2023.  (Dkt. #64-70).  Then, on May 8, 2023, the BPP Defendants appeared, seeking an extension of time to move, answer, or otherwise respond to the Second Amended Complaint, which extension the Court granted on May 9, 2023.  (Dkt. #71-74).  And on July 12, 2023, the BPP Defendants also filed a pre-motion letter seeking leave to dismiss the SAC pursuant to Rules 12(b)(6) and 12(b)(2).  (Dkt. #80).  As a pre-motion conference had already been held, and briefing on the other two motions to dismiss was well underway, the Court forwent its usual pre-motion conference requirement and ordered the parties to proceed directly to briefing on the BPP Defendants' motion to dismiss.  (Dkt. #81).

After receiving an extension, Plaintiff filed her consolidated opposition to the Abbott Defendants' and Parks's motions to dismiss on July 19, 2023.  (Dkt. #82, 83).  The Abbott Defendants and Parks each filed their replies on August 9, 2023.  (Dkt. #84, 85).  After the completion of the briefing on the Abbott Defendants' and Parks's motions to dismiss, the BPP Defendants filed their motion to dismiss on August 11, 2023 (Dkt. #86, 87); Plaintiff filed her

opposition to the BPP Defendants' motion on September 21, 2023 (Dkt. #90); and the BPP Defendants filed their reply on October 6, 2023 (Dkt. #91).

## DISCUSSION

The Court's analysis proceeds in two parts. *First*, the Court considers the challenges to personal jurisdiction raised by Parks and incorporated by the BPP Defendants in their motion. *Second*, the Court evaluates the challenges to the merits of Plaintiff's claim raised by the Abbott Defendants and incorporated by both Parks and the BPP Defendants in their motions.

### A. Plaintiff Has Sufficiently Pleaded Personal Jurisdiction over Parks and the BPP Defendants

To begin, Parks and the BPP Defendants move to dismiss Plaintiff's claims on the basis that Plaintiff cannot establish that either subset of Defendants is subject to personal jurisdiction in New York.[4]  However, and for the reasons set forth herein, the Court finds that, for the purposes of the motions to dismiss, Plaintiff has plausibly alleged that Parks and the BPP Defendants are subject to specific personal jurisdiction in New York arising from their business discussions with Plaintiff in the state.

---

[4]     The BPP Defendants incorporate Parks's jurisdictional arguments by reference, at the conclusion of their memorandum of law in support of their motion to dismiss, and do not advance any additional jurisdictional arguments beyond those raised by Parks, consistent with the Court's instruction that the BPP Defendants "do not need to reiterate arguments already made in briefing … Parks's motions."  (Dkt. #81; BPP Br. 10).

### 1.    Applicable Law

#### a.    Motions to Dismiss Pursuant to Rule 12(b)(2)

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins. Co.* v. *Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996).  To survive a motion to dismiss, a plaintiff need only provide "legally sufficient allegations of jurisdiction." *Id.*  A plaintiff makes such a showing through "an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Id.* at 567 (alteration adopted) (quoting *Ball* v. *Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).

In resolving a Rule 12(b)(2) motion, a court must construe the plaintiff's jurisdictional allegations "in the light most favorable to the plaintiff" and resolve all doubts "in the plaintiff's favor[.]" *Elsevier, Inc.* v. *Grossman*, 77 F. Supp. 3d 331, 341 (S.D.N.Y. 2015) (quoting *A.I. Trade Fin., Inc.* v. *Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993)).  Further, while a court may consider materials beyond the pleadings, these too must be "construe[d] … in the light most favorable to the plaintiff[]." *Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013) (citing *Chloé* v. *Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)).  Still, "[a] *prima facie* case requires non-conclusory fact-specific allegations or evidence showing that activity that constitutes the basis of jurisdiction has taken place." *Chirag* v. *MT*

*Marida Marguerite Schiffarhrts*, 604 F. App'x 16, 19 (2d Cir. 2015) (summary order) (citing *Jazini* v. *Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998)).

### b.    Specific Personal Jurisdiction Under New York Law[5]

Three requirements must be met for a court to exercise specific personal jurisdiction over a defendant:  "First, the plaintiff's service of process upon the defendant must have been procedurally proper.  Second, there must be a statutory basis for personal jurisdiction that renders such service of process effective[.]  Third, the exercise of personal jurisdiction must comport with constitutional due process principles."  *Waldman* v. *Palestine Liberation Org.*, 835 F.3d 317, 327 (2d Cir. 2016) (quoting *Licci*, 673 F.3d at 59-60).

Here, neither party disputes that all Defendants have been properly served, thereby satisfying the first requirement.  Proceeding to the statutory basis for jurisdiction, New York's long-arm statute, contained in New York Civil Practice Law and Rule ("C.P.L.R.") § 302(a), sets forth various bases on which a court may exercise personal jurisdiction over a non-domiciliary.  In particular, C.P.L.R. § 302(a) provides that "a court may exercise personal jurisdiction over any non-domiciliary … who in person or through an agent:

> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

---

[5]    Parks also contends that personal jurisdiction cannot be reached under a theory of general jurisdiction, which contention Plaintiff does not address in her opposition brief. (*Compare* Parks Br. 10, *with* Pl. Abbott Opp. 16-19).  Accordingly, the Court finds this argument to be conceded.  *See AT & T Corp.* v. *Syniverse Techs., Inc.*, No. 12 Civ. 1812 (NRB), 2014 WL 4412392, at *7 (S.D.N.Y. Sept. 8, 2014) (finding that plaintiff's "silence concedes the point" where it failed to discuss opponent's argument in its opposition to a motion for summary judgment); *In re UBS AG Secs. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (considering argument not addressed in opposition to motion to dismiss to be conceded).

2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or

4. owns, uses or possesses any real property situated within the state.

C.P.L.R. § 302(a).

After concluding that "personal jurisdiction is proper under § 302(a) of the New York long-arm statute, th[e] Court must make the ultimate determination whether this jurisdiction satisfies constitutional due process." *Ehrenfeld* v. *Mahfouz*, 489 F.3d 542, 547 (2d Cir. 2007). The due process test for personal jurisdiction "has two related components: the 'minimum contacts' inquiry and the 'reasonableness' inquiry." *Metro. Life Ins. Co.*, 84 F.3d at 567. "The import of the 'reasonableness' inquiry varies inversely with the strength of the 'minimum contacts' showing." *Bank Brussels Lambert* v. *Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002).

### 2. Plaintiff's Allegations Support Personal Jurisdiction Under C.P.L.R. § 302(a)(1)

In this case, Plaintiff maintains that jurisdiction is appropriate over Parks pursuant to C.P.L.R. § 302(a)(1), which governs a non-domiciliary who

"transacts any business within the state or contracts anywhere to supply goods
or services in the state."  To establish jurisdiction under this provision, courts
apply a two-part test, considering "[i] whether the defendant 'transacts any
business' in New York and, if so, [ii] whether this cause of action 'aris[es] from'
such a business transaction."  *Best Van Lines, Inc.* v. *Walker*, 490 F.3d 239,
246 (2d Cir. 2007) (citing *Deutsche Bank Sec., Inc.* v. *Montana Bd. of Invs.*, 7
N.Y.3d 65, 71 (2006)).  Construing Plaintiff's jurisdictional allegations in a
favorable light and resolving all doubts in Plaintiff's favor, as is required, the
Court finds that Plaintiff has satisfied each element.  *See A.I. Trade Fin.*, 989
F.2d at 79-80.

     With respect to the first part of the test, New York courts define
"transact[ing] business" as purposeful activity — "'some act by which the
defendant purposefully avails itself of the privilege of conducting activities
within the forum State, thus invoking the benefits and protections of its laws.'"
*McKee Elec. Co.* v. *Rauland-Borg Corp.*, 20 N.Y.2d 377, 382 (1967) (quoting
*Hanson* v. *Denckla*, 357 U.S. 235, 253 (1958)).  What is more, courts look to
"the totality of the defendant's activities within the forum" to determine
whether a defendant has "transact[ed] business" in such a way that it
constitutes "purposeful activity" in satisfaction of the first part of the test.
*Sterling Nat'l Bank & Trust Co. of N.Y.* v. *Fid. Mortg. Invs.*, 510 F.2d 870, 873-84
(2d Cir. 1975) (internal quotation marks and citation omitted).

     Turning to the facts of this case, Plaintiff — who resides in New York —
alleges that she engaged in email correspondence with Wright on behalf of Blue

Park Productions, through which correspondence she received, signed, and returned the BPP NDA in and from New York.  (SAC ¶¶ 53-54).[6]  *Cf. PDO Max, Inc.* v. *Malcmacher*, No. 21 Civ. 1274 (GTS) (ML), 2022 WL 17415123, at *7 (N.D.N.Y. Dec. 5, 2022) ("The business-transactions prong of the test for specific personal jurisdiction may be met by [defendant's execution of] [an] MDA [*i.e.*, Mutual Non-Disclosure Agreement] with a New York business." (citing *Best Van Lines*, 490 F.3d at 249)).  Plaintiff thereafter sent copies of the Work and a related "story bible" to BPP from New York.  (*Id.* ¶¶ 55-56).  Finally, Plaintiff alleges that she had at least one call with Parks and Wright, while Plaintiff was in New York, in which Parks and Wright told Plaintiff that they would present her Work to New York-based television outlets and provided Plaintiff with their notes.  (*Id.* ¶¶ 63-65).

Moreover, Plaintiff's subsequent discussions with and provision of her Work to Parks and the BPP Defendants, which activities were conducted from New York in anticipation of a possible placement deal (albeit one that was

---

[6]     Parks emphasizes that she did not actually send the non-disclosure agreement to Plaintiff, but rather that the agreement was transmitted by her partner, Wright. (Parks Reply 4).  Such an argument is immaterial at this stage, as Plaintiff sufficiently alleges that the NDA was transmitted by Wright for the benefit of Blue Park Productions, LLC, of which LLC both Parks and Wright were co-founders, and that Parks and Wright both took subsequent actions on behalf of themselves and Blue Park Productions, LLC by meeting with Plaintiff to discuss her Work.  *See Allstate Ins. Co.* v. *Mah*, No. 19 Civ. 2866 (ARR) (RML), 2019 WL 5537589, at *4 (E.D.N.Y. Oct. 25, 2019) ("The conduct of an LLC member can in some circumstances be attributed to the LLC for purposes of jurisdiction," where there are "additional facts alleged beyond the bare fact of being a part owner." (first citing *New Media Holding Co. LLC* v. *Kagalovsky*, 949 N.Y.S.2d 22, 24 (1st Dep't 2012) (holding that a Delaware LLC was subject to jurisdiction in New York based on controlling partner's negotiation of contract in New York, where he acted with knowledge and consent of other partners), and then citing *CutCo Indus., Inc.* v. *Naughton*, 806 F.2d 361, 366 (2d Cir. 1986) (holding that conduct of a partner in a partnership can be the basis for jurisdiction because New York law states that every partner is an agent of the partnership))).

never consummated), constitute "preliminary activities ... [that] substantially advance, or were essential to, the formation of [an] [agreement]." *SHLD, LLC* v. *Hall*, No. 15 Civ. 6225 (LLS), 2016 WL 659109, at \*5 (S.D.N.Y. Feb. 17, 2016) (observing that the execution of "a non-disclosure agreement between the plaintiff[] and [defendant]" supported a finding of personal jurisdiction under C.P.L.R. § 302(a)(1) (citing *Ainbinder* v. *Potter*, 282 F. Supp. 2d 180, 187 (S.D.N.Y. 2003) ("Preliminary negotiations conducted in New York qualify as a transaction of business if they have substantially advanced or were substantively important or essential to the formation of a contract outside New York."))).[7]  The foregoing allegations, taken as true and considered in their totality, support the preliminary finding that Parks, Wright, and BPP transacted business in New York.  (SAC ¶ 51).

As to the second element necessary to establish jurisdiction pursuant to C.P.L.R. § 302(a)(1) — "whether this cause of action 'aris[es] from'" Defendants' business transactions in New York, *Best Van Lines*, 490 F.3d at 246 — it is

---

[7]    Here, it is the specific allegation of the provision of the BPP NDA for execution by Plaintiff in New York, accompanied by the allegations that Parks and the BPP Defendants' "projected [themselves] into New York" to meet with Plaintiff in anticipation of a potential business transaction, *Bank Brussels Lambert* v. *Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 789 (2d Cir. 1999), that distinguishes those cases, identified by Parks, in which courts found no specific personal jurisdiction based on allegations of phone or video calls, emails, faxes, and paper mail alone.  (*See* Parks Reply 4).  *See Yih* v. *Taiwan Semiconductor Mfg. Co.*, 815 F. App'x 571, 574-75 (2d Cir. 2020) (summary order) (holding that "two Skype interviews and emails through a third-party agent regarding a position in Taiwan for which [the plaintiff] was not hired [] were too limited to amount to a purposeful transaction of business in New York"); *DirecTV Latin Am., LLC*, v. *Park, 610, LLC*, 691 F. Supp. 2d 405, 420 (S.D.N.Y. 2010) (finding that defendant's telephone conference calls, without more, were insufficient to establish that defendant "'projected himself' into New York to engage in a 'sustained and substantial transaction of business'" (quoting *Parke-Bernet Galleries, Inc.* v. *Franklyn*, 26 N.Y.2d 13, 18 (1970) (alteration adopted))).

evident that the alleged claims of infringement arise from BPP's business transactions with Plaintiff, through Parks and Wright, given the causal connection between the execution of the NDA and Plaintiff's provision of the allegedly infringed-upon Work to BPP; Plaintiff's allegations of subsequent conversations with Parks and Wright regarding her Work and the possibility of its placement at various studios, including the New York-based Defendant ABC; and Plaintiff's allegations that Parks, Wright, and BPP provided a copy of Plaintiff's Work to the Abbott Defendants, giving rise to the current claim. (SAC ¶¶ 48-71).

Having found specific jurisdiction appropriate under C.P.L.R. § 302(a)(1), the Court proceeds to the accompanying due process considerations.  As noted above, this analysis is similarly comprised of two elements, as the Court must consider whether the "out-of-state defendant … [i] has 'certain minimum contacts with [New York] [ii] such that maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"  *Dong Chul Kim* v. *Harte Hanks, Inc.*, 425 F. Supp. 3d 246, 255 (S.D.N.Y. 2019) (quoting *Int'l Shoe Co.* v. *State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945)).

Here, the first element is satisfied, because the Court's finding that Plaintiff has plausibly alleged that Parks and Wright, individually and through BPP, transacted business with Plaintiff in New York also provides that Plaintiff has met her burden to show that certain minimum contacts with New York exist.  *Cf. Best Van Lines*, 490 F.3d at 247 (observing that the "'purposeful

availment' language defining 'transacting business' has been adopted by the
New York Court of Appeals from Supreme Court cases analyzing the
constitutional limitations on a state's power to assert personal jurisdiction over
a non-domiciliary defendant" (alteration adopted) (quoting *Kreutter* v.
*McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988))).

Moving to the second element, when weighing traditional notions of fair
play and substantial justice, the Court considers

> [i] the burden that the exercise of jurisdiction will
> impose on the defendant; [ii] the interests of the forum
> state in adjudicating the case; [iii] the plaintiff's interest
> in obtaining convenient and effective relief; [iv] the
> interstate judicial system's interest in obtaining the
> most efficient resolution of the controversy; and [v] the
> shared interest of the states in furthering substantive
> social policies.

*Metro. Life Ins. Co.*, 84 F.3d at 568.  Parks's argument, in relevant part,
addresses only the first and third factors, maintaining that "[t]he burden on
Ms. Parks here outweighs all other interests, including any interest [Plaintiff]
has in adjudicating her claim in the Southern District of New York."  (Parks
Br. 16).  Still, the costs in time and expense faced by Plaintiff to prosecute her
action in the Western District of Pennsylvania, wherein Parks currently resides,
present the mirror-image of Parks's burden argument, rendering the competing
considerations of burden neutral, absent the development of additional facts.
Moreover Parks's mere recitation that she "lives and works … over 350 miles
away" from New York, and that "[d]efending this suit, which will most likely
require Ms. Parks to be deposed and participate in other hearings and court
proceedings" in New York (*id.* at 16-17), is tempered by the fact that "the

conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago," *Metro. Life Ins. Co.*, 84 F.3d at 574.

Parks does not address any of the remaining factors in her due process argument, and the Court's own review finds that they are at best either neutral or slightly in favor of this Court's jurisdiction. Considerations of efficiency favor personal jurisdiction over Parks in the Southern District of New York, given the multi-defendant nature of this case and the fact that the Abbott Defendants, who would be key witnesses and provide critical evidence in Plaintiff's claims against Parks, have consented to litigating this case in this District. *See Metro. Life Ins. Co.*, 84 F.3d at 574 ("In evaluating this factor, courts generally consider where witnesses and evidence are likely to be located."). Similarly, the interests of New York, as the forum state, slightly favor jurisdiction, given Plaintiff's status as a New York resident and the fact that the allegations plausibly support the finding that at least some conduct took place in New York. Finally, the shared interests of the states in furthering substantive social policies are neutral where the parties' dispute exclusively concerns federal copyright law. *Cf. T.M. Hylwa, M.D., Inc.* v. *Palka*, 823 F.2d 310, 316 (9th Cir. 1987) (observing that interstate federalism concerns are neutral, as neither state has any greater interest in "resolving ERISA disputes … involving one of its residents"); *Chamberlain Grp., Inc.* v. *Techtronic Indus. Co., Ltd.*, No. 16 Civ. 6097 (HDL), 2017 WL 3394741, at *7 (N.D. Ill. Aug. 8, 2017) ("[T]he shared interests of the States in furthering fundamental

social policies [] have little purchase [w]here [] the case involves the application of uniform federal patent law, not state law.").  Considering these factors as a whole, and drawing all inferences in Plaintiff's favor, the Court finds that a preliminary exercise of personal jurisdiction over Parks (and, by extension, the BPP Defendants) would not offend traditional notions of fair play and substantial justice, and therefore that Plaintiff has satisfied the due process prong of the analysis.

Accordingly, the Court, on the preliminary record before it, finds that Plaintiff has provided "legally sufficient allegations of jurisdiction." *Metro. Life Ins. Co.*, 84 F.3d at 566.  That is not to say that Plaintiff's jurisdictional allegations are ironclad, as "[e]ventually personal jurisdiction must be established by a preponderance of the evidence, either at an evidentiary hearing or at trial." *A.I. Trade Fin.*, 989 F.2d at 79-80.  Still, the Court's subsequent finding, *see infra*, that dismissal of Plaintiff's entire action under Rule 12(b)(6) is appropriate, renders moot the need for any further jurisdictional discovery or potential evidentiary hearing.

## B.    Plaintiff Has Not Plausibly Alleged That Defendants Engaged in Illegal Copying of the Work

Proceeding to the merits of the parties' dispute, Plaintiff's sole cause of action is for copyright infringement, pursuant to the Copyright Act, 17 U.S.C. § 501, based on Defendants' alleged unlawful copying *This School Year*.  For the reasons discussed below, this claim, along with any hypothetical ancillary claim for contributory infringement, must be dismissed.  Plaintiff has not

plausibly alleged that Defendants engaged in any unlawful copying of the

Work, as the Court's comparison of *This School Year* and *Abbott Elementary*

makes plain that no discerning ordinary observer would find the works to be

substantially similar.

      **1.**      **Applicable Law**

          **a.**      **Motions to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)**

Under Rule 12(b)(6), a defendant may seek dismissal of a plaintiff's

action for "failure to state a claim upon which relief can be granted."  Fed. R.

Civ. P. 12(b)(6).  When considering a motion to dismiss pursuant to Rule

12(b)(6), a court must "draw all reasonable inferences in [the] [p]laintiff['s]

favor, 'assume all well-pleaded factual allegations to be true, and determine

whether they plausibly give rise to an entitlement to relief.'"  *Faber* v. *Metro. Life

Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Selevan* v. *N.Y. Thruway

Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662,

678 (2009).  A plaintiff is entitled to relief if the complaint contains "enough

facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.* v.

*Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502

F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact

pleading of specifics, it does require enough facts to 'nudge [plaintiff's] claims

across the line from conceivable to plausible.'" (quoting *Twombly*, 550 U.S. at

570)).  Moreover, "[w]here a complaint pleads facts that are 'merely consistent

with' a defendant's liability, it 'stops short of the line between possibility and

plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *see generally United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2679 (2022).  Beyond this narrow universe of materials, a court may also consider "facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence" and may "disregard allegations in a complaint that contradict or are inconsistent with judicially-noticed facts." *Exch. Listing, LLC* v. *Inspira Techs., Ltd.*, 661 F. Supp. 3d 134, 153 (S.D.N.Y. 2023) (internal quotation marks and citations omitted).

### b.  Claims for Copyright Infringement Under the Copyright Act of 1976

"To establish a claim of copyright infringement, 'two elements must be proven: [i] ownership of a valid copyright, and [ii] copying of constituent elements of the work that are original.'" *Abdin* v. *CBS Broad. Inc.*, 971 F.3d 57, 66 (2d Cir. 2020) (quoting *Feist Publ'ns, Inc.* v. *Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).  "To satisfy the second element, a plaintiff 'must demonstrate that: [i] the defendant has actually copied the plaintiff's work; and [ii] the

copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's [work]." *Id.* (quoting *Yurman Design, Inc.* v. *PAJ Inc.*, 262 F.3d 101, 110 (2d Cir. 2001)).

Courts apply two different standards when assessing claims of infringement.  "Where the disputed works are entirely protectible, '[t]he standard test for substantial similarity between two items is whether an ordinary observer, unless [she] set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as the same.'" *Effie Film, LLC* v. *Pomerance*, 909 F. Supp. 2d 273, 291 (S.D.N.Y. 2012) (quoting *Yurman Design*, 262 F.3d at 111).  "Where a work contains both protectable and unprotectable elements, however, the analysis must be 'more discerning.'"  *Montgomery* v. *Holland*, 408 F. Supp. 3d 353, 362 (S.D.N.Y. 2019) ("*Montgomery I*") (quoting *Peter F. Gaito Arch., LLC* v. *Simone Dev. Corp.*, 602 F.3d 57, 66 (2d Cir. 2010)), *aff'd sub nom. Montgomery* v. *NBC Television*, 833 F. App'x 361 (2d Cir. 2020) (summary order).  "Specifically, '[the Court] must attempt to extract the unprotectible elements from our consideration and ask whether the protectible elements, standing alone, are substantially similar.'" *Effie Film*, 909 F. Supp. 2d at 291 (quoting *Knitwaves, Inc.* v. *Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1002 (2d Cir. 1995)).

"Only 'the expression of ideas' is protected, 'not the ideas themselves.'" *Montgomery I*, 408 F. Supp. 3d at 362 (quoting *Gaito*, 602 F.3d at 67).  As applied in detail below, "[c]ourts have developed a number of general principles to identify the elements of a work that are 'free for the taking' and therefore not

protectable." *Id.* (quoting *Tufenkian Imp./Exp. Ventures, Inc.* v. *Einstein Moomjy, Inc.*, 338 F.3d 127, 134-35 (2d Cir. 2003)).  For example, "facts are not copyrightable[.]" *Feist*, 499 U.S. at 344.  Further, "copyright protection does not extend to '*scènes à faire*,' or devices, elements, or sequences of events that 'necessarily result from the choice of a setting or situation.'" *Montgomery I*, 408 F. Supp. 3d at 363 (quoting *Williams*, 84 F.3d at 587).

"Still, 'even a compilation of unprotectable elements may enjoy copyright protection when those elements are arranged in an original manner.'" *Montgomery I*, 408 F. Supp. 3d at 363 (quoting *Hogan* v. *DC Comics*, 48 F. Supp. 2d 298, 309 (S.D.N.Y. 1999)).  "Ultimately, then, the court's inquiry 'focuses on whether the alleged infringer has misappropriated the original way in which the author has selected, coordinated, and arranged' the elements of … her work.'" *Id.* (quoting *Gaito*, 602 F.3d at 66).  And in this inquiry, the court is "principally guided by 'comparing the contested [work's] total concept and overall feel with that of the allegedly infringed work,' as instructed by [the court's] 'good eyes and common sense,'" *Gaito*, 602 F.3d at 66 (first quoting *Tufenkian*, 338 F.3d at 133, and then quoting *Hamil Am. Inc.* v. *GFI*, 193 F.3d 92, 102 (2d Cir. 1999)), as well as an examination of "similarities in the theme, setting, characters, time sequence, plot, and pace," *Montgomery I*, 408 F. Supp. 3d at 363 (quoting *Williams*, 84 F.3d at 589).  "It is only where the points of dissimilarity exceed those that are similar and those similar are — when compared to the original work — of small import quantitatively or qualitatively

that a finding of no infringement is appropriate." *Rogers* v. *Koons*, 960 F.2d 301, 308 (2d Cir. 1992).

"Though the issue of substantial similarity is frequently a fact issue for jury resolution," *Warner Bros., Inc.* v. *Am. Broad. Cos.*, 720 F.2d 231, 239 (2d Cir. 1983), "[t]he Second Circuit has made it plain that where, as here, the works are incorporated into the complaint by reference, 'it is entirely appropriate for [a court] to consider the similarity between those works in connection with a motion to dismiss, because the court has before it all that is necessary in order to make such an evaluation,'" *Amanze* v. *Adeyemi*, No. 18 Civ. 8808 (NRB), 2019 WL 2866071, at *5 n.4 (S.D.N.Y. July 3, 2019) (quoting *Gaito*, 602 F.3d at 64), *aff'd*, 824 F. App'x 86 (2d Cir. 2020) (summary order). "In other words, 'no discovery or fact-finding is typically necessary, because what is required is only a ... comparison of the works.'" *Montgomery I*, 408 F. Supp. 3d at 363 (quoting *Gaito*, 602 F.3d at 64). "On such a comparison, 'the works themselves supersede and control ... any contrary allegations, conclusions[,] or descriptions of the works contained in the pleadings.'" *Id.* at 363-64 (quoting *Gaito*, 602 F.3d at 64).

## 2.    Plaintiff Fails to Establish Substantial Similarity

The Abbott Defendants, and Parks and the BPP Defendants by incorporation, move under Rule 12(b)(6) to dismiss Plaintiff's copyright claims principally on the basis that the works are not substantially similar.[8]

---

[8]    The Abbott Defendants raise in a footnote their theory that Plaintiff's allegations of access rest on pure speculation and cannot support a finding that the Defendants had a "reasonable possibility" of access.  (Abbott Br. 6 n.7).  As the Court decides that

Defendants attack the works' similarity at both specific and general levels. *First*, Defendants maintain that any similarities identified by Plaintiff across the two works either have their root in common and unprotectible elements that cannot support a copyright claim, or are not actually similar at all, as evidenced by a discerning ordinary observer's consideration of both works. (Abbott Br. 7-19).[9]  *Second*, Defendants argue that the total concept and overall feel of both works are distinct.  (*Id.* at 17-18).  For the reasons set forth below, the Court finds Defendants to be correct on both points, and therefore grants their motion to dismiss.

### a.   The Specific Elements of Both Works Are Not Substantially Similar

The Court begins its analysis by "extract[ing] the unprotectible elements from [its] consideration and ask[ing] whether the protectible elements, standing alone, are substantially similar." *Knitwaves*, 71 F.3d at 1002.  In service of her allegations and pertinent to the Court's task, Plaintiff proffers Exhibit E to her SAC, which lists each of her twenty-two alleged "substantial similarities [in] plot, characters, dialogue, setting[,] and theme." (*See generally* SAC, Ex. E).  In this case, however, the Court's own close review of Plaintiff's list, alongside its broader review of the works themselves, finds that each of Plaintiff's alleged

---

Defendants' motions to dismiss must be granted because Plaintiff has failed to establish that the two works are substantially similar, it need not reach Defendants' arguments regarding access.

9       Plaintiff does not expressly dispute that the discerning ordinary observer standard should apply in this case.  (*See* Pl. Abbott Opp. 6-7).  Nor could she, given that the works at issue in this case clearly "contain[] both protectable and unprotectable elements." *Montgomery* v. *Holland*, 408 F. Supp. 3d 353, 362 (S.D.N.Y. 2019).

similarity either implicates unprotectible general expressions, or does not actually implicate any similarity at all, as the underlying works reveals that the works are not similar in the manner alleged. *Williams*, 84 F.3d at 590 (cautioning that a plaintiff's list of similarities, on its own, risks being "inherently subjective and unreliable" (internal quotation marks and citation omitted)).

### i. The Plot and Themes of Both Works Are Appreciably Different

For starters, Plaintiff maintains that the theory of comedy underlying the plots of both works is substantially similar: Plaintiff suggests that the protagonists struggle with "the same goal: to both survive and thrive in their chosen professions and cultivate a spirit of learning and accomplishment amongst the students," amidst a "bureaucratic system that continually pitches curveball after curveball to the teachers." (Pl. Abbott Opp. 11). Plaintiff's argument, however, suffers from two principal flaws. *First*, a plot based on an idealistic teacher's struggle to inspire her students in the face of bureaucratic challenges from a school's administration is a generalized idea that is not copyrightable.[10] The same is true with respect to similarities such as both

---

[10] Indeed, similar general plots about the idealism of teachers and other educators, and the challenges of school administrations, are implicated in myriad films including *Akeelah and the Bee*; *Coach Carter*; *Dead Poets Society*, and *To Sir, with Love*, *inter alia*, and the Court may take judicial notice of the general plot for each, as these facts are both generally known within the Court's territorial jurisdiction; and capable of accurate and ready determination by resort to accurate sources. *Accord* Fed. R. Evid. 201; *see also Twentieth Cent. Fox Film Corp.* v. *Marvel Enters., Inc.*, 155 F. Supp. 2d 1, 41 & n.71 (S.D.N.Y. 2001) (taking judicial notice of the film *Star Wars*, "one of the most well-known and widely viewed science fiction films," as the facts of a film of such magnitude are "a matter of common and general knowledge in [the Court's] jurisdiction" (citing Fed. R. Evid. 201(b))).

works' use of "the same theme of set up and disappointment about a 'Big Surprise,'" which, without more, are simply generic plot devices common across myriad works. (SAC, Ex. E ¶ 5). *See Denker* v. *Uhry*, 820 F. Supp. 722, 732 (S.D.N.Y. 1995) ("[G]eneralized plot devices ... are not entitled to copyright protection.").

Second, while both works depict the lives of idealistic teachers working in an inner-city public school, "in moving to the next level of specificity, differences in plot and structure far outweigh this general likeness." *Arden* v. *Columbia Pictures Indus., Inc.*, 908 F. Supp. 1248, 1260 (S.D.N.Y. 1995) (quoting *Walker* v. *Time Life Films, Inc.*, 784 F.2d 44, 49 (2d Cir. 1986))). For example, while Plaintiff argues that the two theories of comedy are the same because "the main characters [in both works] use nearly identical [introductory] speeches to express their frustration and their optimism about teaching in a challenging inner-city school," Plaintiff's position breaks down upon an actual review of both works' opening scenes. (SAC, Ex. E ¶ 2). *This School Year* opens on a darker note, finding the "naïve, bothered, [and] unenthused" Davis alone, "in distress," "repeatedly ... bang[ing] her head against a book." (TSY 1). By contrast, *Abbott Elementary* introduces Teagues as a "ball of optimistic energy, quirky, bookish, [and] ready to take on the world," situating her "mid-lesson sitting with some [second] graders at their desks." (AE 1).

These differences in tone are thrown into sharper relief by the dialogue that follows. In *This School Year*, Davis begins the show apprehensive,

questioning:  "Why am I here?  Do I not deserve more in life?  I'm not trying to question you God.  I mean, I'm just saying.  I'm just asking you to get me through this school year … alive.  No?  OK."  (TSY 1 (alteration in original)).  Davis's manifestations of her exasperation and distress (*i.e.*, her banging of her head against a book) require intervention by her colleagues, prompting an extensive dialogue about Davis's desire to obtain tenure and Davis's palpable disappointment at learning that her chances of tenure may have been derailed by the replacement of the school's principal.  (*Id.* at 1-4).  Indeed, news of that principal's replacement prompts Ms. Davis to appear "as if [she] was just stabbed in the back," "on the brink of tears," and "sobbing," all to the skepticism of her colleagues, who chide her for being "dramatic."  (*Id.* at 4; *see also id.* ("Mr. West:  … and the [O]scar goes to…")).

Far from "copy[ing] the identical message and tone for the opening speech[] of [its] protagonist," as Plaintiff would have it, *Abbott Elementary* introduces its protagonist and supporting characters in a markedly more happy-go-lucky way.  (Pl. Abbott Opp. 12).  Teagues's monologue is decidedly more optimistic and hopeful than Davis's, and is delivered in a different format, intercut with lighthearted vignettes depicting the relative chaos of her classroom and those of her colleagues, unlike the pointed dialogue in *This School Year.*  (AE 1-3).  Even the references to Teagues's frustrations are depicted in a comedic, upbeat light.  (*Id.* at 3 (suggesting Teagues "sub[bed] out therapy for axe-throwing," and interposing a cutscene depicting the activity)).  Ultimately, the "entirely different contexts" of the opening monologues and

their differences in tone, *Shull* v. *TBTF Prods., Inc.*, No. 20-3529, 2021 WL 3027181, at *2 (2d Cir. July 19, 2021) (summary order), defeat Plaintiff's attempt, by *ipse dixit* alone, to declare the two speeches "nearly identical" (SAC, Ex. E ¶ 2).

Likewise, while the pilot episodes of both series contain subplots involving "the lead characters losing a crucial piece of their classroom furniture," the actual execution of these subplots is markedly different across both works. (SAC, Ex. E ¶ 5). As an initial matter, the subplot itself follows naturally from the broader, unprotectable theme of working in an under-resourced public school, rather than from Plaintiff's creativity. *See MyWebGrocer, LLC* v. *Hometown Info, Inc.*, 375 F.3d 190, 194 (2d Cir. 2004) (holding that "unprotectible elements that follow naturally from a work's theme rather than from an author's creativity" cannot support a claim of infringement). More importantly, however, the actual way in which the subplot plays out across each episode is once again appreciably different. In *This School Year*, the item at issue is Davis's desk, and its actual loss occurs in the short, final scene in the pilot, with Davis "walk[ing] into her classroom and slam[ming] the door behind her," before realizing in distress that her desk has been stolen, prompting her to "scream[] from the top of her lungs and throw[] a book at the blackboard," after which the episode fades to a conclusion. (TSY 28).

By contrast, in *Abbott Elementary*, the loss of the rug is a running conceit throughout the entire episode, providing a vehicle to introduce serious

topics, such as the fact that the rug is necessary to provide a safe space for students with difficult home lives, as well as comedic elements, through the provision of ostensibly stolen rugs as a solution.  (*See* Abbott Br. 12-13 (collecting citations to the *Abbott Elementary* pilot episode)).  While the desk in *This School Year* provides a coda to the episode's broader emphasis on Davis's frustrations with the resource constraints at the school, the rug in *Abbott Elementary* demonstrates the protagonist's drive to make a change for her students regardless of how steep the battle, and her colleagues' ultimate decision to work together to support her naïve optimism.

Considering these various examples as a whole, the Court finds that Plaintiff has not established that the plot and themes of *This School Year* and *Abbott Elementary* are substantially similar.

### ii.    The Characters in Both Works Are Dissimilar

"In determining whether characters are similar, a court looks at the 'totality of the characters' attributes and traits' as well as the extent to which the defendants' characters capture the 'total concept and feel' of figures in the plaintiff's work."  *Abdin* v. *CBS Broad., Inc.*, 405 F. Supp. 3d 591, 599 (S.D.N.Y. 2019) (alteration adopted) (quoting *Sheldon Abend Revocable Tr.* v. *Spielberg*, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010)); *see also Walker*, 784 F.2d at 50).  On this topic, Plaintiff maintains that the "similarities between the characters in [both works is] so compelling that they are interchangeable."  (Pl. Abbott Opp. 13).  Once again, however, a closer examination of the at-issue characters reveals that Plaintiff's assertions are unfounded.

35

### (a)    The Protagonists in Each Work Are Distinct

The Court begins with a comparison of the protagonists of both works: Davis in *This School Year* and Teagues in *Abbott Elementary*.  Plaintiff is technically correct that "[b]oth works have young, African American, female, lead characters" in their second year of teaching at an inner-city school.  (SAC, Ex. E ¶ 1; Pl. Abbott Opp. 13).  It is well established, however, that "generic and generalized character traits such as race, gender, and hair color are not protectible." *Abdin*, 971 F.3d at 67.  Similarly, the fact that both works situate the protagonists in their second year of teaching "follows naturally" from the broader, unprotectible theme of the naïve-but-capable teacher, *MyWebGrocer*, 375 F.3d at 194, and is also too generic to serve as protectable characteristic, *Abdin*, 971 F.3d at 67.

The same is true for each protagonists' involvement in step coaching, as such involvement follows naturally from stepping's relationship to each show's broader representation of Black culture and the fact that stepping is a well-known extracurricular activity, notwithstanding Plaintiff's conclusory argument to the contrary.  (SAC, Ex. E ¶ 3 ("In both works, the lead characters are step coaches.  Not chess club, not cheerleading, not school paper coaches but step coaches, a rarer and more unique talent.")).  *See Stepping*, ENCYC. BRITANNICA (Dec. 21, 2015) (discussing stepping's origins in and associations with Black culture, and observing that while "[s]tepping was developed by African American fraternities and sororities in the mid-20th century … it has become a recreational competitive activity in some American high schools"), *available at*

https://www.britannica.com/art/stepping [https://perma.cc/8HEZ-JJ4D].

And once again, the context in which stepping appears in both works is

decidedly distinct, upon closer examination.  In *This School Year*, the step team

is referenced in a passing exchange between the protagonist and the school's

white principal, and is illustrative of the principal's out-of-touch nature.

(TSY 27).  To the contrary, in *Abbott Elementary*, the step team narrative

throws into comedic tension the trope of the self-interested principal by casting

Principal Coleman in a positive light, providing thoughtful insight into her

backstory, and illustrating her rapport with the students, all to the surprise

and ultimate respect of the protagonist.  (*See generally* Strom Decl., Ex. 1,

Disc 9 (*Abbott Elementary*, Episode 9, "Step Class")).

 Given these substantial differences in execution, and the fact that "[t]he

bar for substantial similarity in a character is set quite high," the mere fact

that both protagonists were involved in subplots involving step teams cannot

render both characters substantially similar for the purposes of an

infringement claim.  *Sheldon Abend Revocable Tr.*, 748 F. Supp. 2d at 208.

Indeed, "[c]ourts in this [C]ircuit have routinely denied character infringement

claims sharing far more similar characteristics and features."  *Abdin*, 971 F.3d

at 72 (citing *Cabell* v. *Sony Pictures Entm't, Inc.*, 714 F. Supp. 2d 452, 454

(S.D.N.Y. 2010) (granting summary judgment where characters were both

military-trained hairstylists who fight crime with hairdryers as weapons), *aff'd*,

425 F. App'x 42 (2d Cir. 2011) (summary order)); *see also, e.g.*, *Arden*, 908 F.

Supp. at 1261 (finding no substantial similarity between two thirty-something, self-centered bachelors who both become trapped in a repeating day)).

Moreover, a closer examination of the scripts and dialogue reveals that each character has an appreciably different attitude towards their positions as teachers.  In particular, Davis's attitude towards teaching is influenced in prominent part by her desire to obtain tenure.  (SAC, Ex. H).  This attitude is poignantly depicted in the opening scene of *This School Year*, where Davis delivers a monologue emphasizing her view that "[t]enure is power," and further exhorting:  "[tenure is] every teacher's dream.  You're invincible. … I deserve it. It's just the thought of another school year right now is killing me."  (TSY 3). Following this scene, discussions of tenure appear throughout the arc of the pilot episode, providing a window into the motivations of Davis and her colleagues, and establishing the stakes associated with the appointment of a new principal.  (*See id.* at 6, 7, 10, 18, 22, 24, 25, 27).

In *Abbot Elementary*, on the other hand, Teagues's motivations as a teacher are linked to her own experiences as a student in the public school system (*see, e.g.*, AE 1 ("As a product of the Philadelphia school system, I'm proud to say I survived, and can now teach here today!"), 5 (Teagues confessing:  "I wanted to be just like … my favorite teacher from 3rd grade. … I was like … obsessed with her, actually.")), as well as her unflappable optimism and desire to make a change for the children in her school, as expressed in her exchange with two senior teachers after failing in her initial attempt to secure replacement rugs (*id.* at 29 ("I don't care whether you think I'm good at this

38

anymore.  I care about whether or not I can make change.  At [Abbott].  Where it's needed most.")).

Altogether, Davis's portrayal departs from that of Teagues, as Davis presents a more pragmatic representation of the incentives of teachers, as acknowledged by Plaintiff in her own synopsis of her work.  (SAC, Ex. H ("[T]he teachers, staff, and students have their own agenda, especially Ms. Davis ... [who] is trying to convince everyone else that the school needs to be reformed and secretly wants to secure her spot as a tenured teacher.")).  While there is nothing in either work to suggest that both characters are not equally motivated to help their students at the end of the day, this shared, admirable quality alone is insufficient to overcome the significant differences in the portrayal of each protagonist.

### (b)   The Remaining Characters in Each Work Are Also Distinct

The Court's review of the remaining cast of characters proceeds in a similar fashion and reaches a similar conclusion.  As a threshold matter, the vast majority of similarities among the remaining characters identified by Plaintiff, including that of young, naïve teachers (SAC, Ex. E ¶¶ 1, 15), and seasoned, experienced mentors (*id.* ¶¶ 6, 15-16), arise from use of "stock characters and situations [that] are inherent in the use of the school as a background and are not copyrightable."  *Burnett* v. *Lambino*, 204 F. Supp. 327 (S.D.N.Y. 1962) (observing that "in each work, there are idealistic teachers, cynical teachers, stupid students, intelligent students[,] and unruly students and relationships between them," and finding that those characters, without

more, cannot support a claim of infringement); *see also Abdin*, 971 F.3d at 72 (remarking that "basic character type[s] … [are] not entitled to copyright protection" (citing *Hogan*, 48 F. Supp. 2d at 310)); *Campbell* v. *Walt Disney Co.*, 718 F. Supp. 2d 1108, 1112 (N.D. Cal. 2010) ("find[ing] [a] young mentee-older mentor storyline to be a 'basic plot idea … not protected by copyright law'" (quoting *Cavalier* v. *Random House, Inc.*, 297 F.3d 815, 824 (9th Cir. 2002))).

The same is true with respect to both works' depiction of "self-centered, self-involved" principals (SAC, Ex. E ¶¶ 9-11); "characters that were passed over for the principal position" (*id.* ¶ 14); and "older, more experienced teachers warning the lead characters not to be taken advantage of by the system" (*id.* ¶ 20), as these similarities at best reflect "merely the broader outlines" of personalities found in an inner-city public school, and do not establish that "plaintiff's original conception sufficiently developed the character[s]." *Hogan*, 48 F. Supp. 2d at 310 (internal quotation marks and citation omitted).

What is more, on closer examination, the details of these additional characters differ, consistent with the thematic and tonal differences of the works. For example, while the principals are introduced through the well-traveled tropes of the "school principal who is pompous … [and] uninterested in teaching problems," the actual developments, *vel non*, of Principals Coleman and Lyons diverge. *Burnett*, 204 F. Supp. at 332. While *Abbott Elementary* utilizes Principal Coleman's conceited qualities as a comedic foil to the diligence of the teachers in the show, the show pointedly reveals, in episodes such as "Step Class," discussed above, that certain of Principal Coleman's

40

shortcomings are only surface-level, and that there is more to her character than meets the eye.  By contrast, there is no indication in *This School Year* that Principal Lyons possesses similar qualities upon which to base any inference that the two characters are comparable.  *Abdin*, 971 F.3d at 70 (emphasizing the distinctness of two characters where "it is unclear what role the nameless tardigrade plays in the Videogame," whereas the television show's tardigrade "is very much at the center of a fully-developed story").

Additionally, stock tensions amongst these characters, such as the exasperation of coworkers with one another, are simply *scènes à faire* in workplace comedies.  (SAC, Ex. E ¶ 17).  Copyright protection does not extend to "'stock' themes commonly linked to a particular genre."  *Walker*, 784 F.2d at 50.  The same is true for the "will they, won't they" romantic tension between coworkers, and the wordplay associated with naming each character "Mr. Wright."  (*Id.* ¶ 12).  *Accord Cortes* v. *Univ. Music Latino*, 477 F. Supp. 3d 1290, 1299 (S.D. Fla. 2020) ("'Common expressions and clichés' ... are not copyright protectable." (quoting *Steele* v. *Turner Broad Sys., Inc.*, 646 F. Supp. 2d 185, 191 (D. Mass. 2009))).

Copyright protection also does not extend to passing jokes about graying hair and references to the well-known Whitney Houston song, *Greatest Love of All*, and its line "I believe the children are our future."  (SAC, Ex. E ¶¶ 7, 19).[11]

---

[11]    For one, Plaintiff is incorrect in her assertion that "[b]oth works make a joke about teachers going gray in their opening episodes," as there is no reference to Plaintiff's cited line anywhere in the pilot for *Abbott Elementary*.  (SAC, Ex. E ¶ 19 ("[T]he reference to teachers growing gray hair is repeated in *Abbott Elementary*, when Ms. Barbara tells Ms. Teagues that 'teachers are growing gray hairs because they cannot

The fact that the time-honored association between graying hair and challenging work environments appears both in Plaintiff's Work and in one episode of the 13-episode season of *Abbott Elementary* is insufficient to sustain a copyright claim.  Likewise, use of Whitney Houston's well-known opening lyric flows expectedly from the school setting and is not evidence of protectable similarity.  *Cf. Peters* v. *West*, 692 F.3d 629, 635 (7th Cir. 2012) (observing that each song's common reference to the phrase "what does not kill me, makes me stronger," originally authored by philosopher Fredrich Nietzsche, had become a "ubiquitous … common saying" that could not, without more, serve as the basis for a claim of infringement).

Even the more particular commonalities identified by Plaintiff fail to implicate protectable similarities.  While both works involve dialogue by characters referencing the multiple roles played by teachers, such as social workers, counselors, and parents (SAC, Ex. E ¶ 22), recognition of the complex responsibilities often required of teachers is, unfortunately, "indispensable, or at least standard in the treatment" of a work set in an inner-city public school.  *Zalewski* v. *Cicero Builder Dev., Inc.*, 754 F.3d 95, 102 (2d Cir. 2014) (observing that "cowboys, bank robbers, and shootouts in stories of the American West — get no protection" (internal quotation marks omitted)).

Notwithstanding these similarities, each character's observation that they are performing these myriad roles for one salary arises in an appreciably

---

keep up.'") *But see generally* AE 1-33).

different context and is delivered with a dissimilar tone.  In *This School Year*, Davis makes this observation to emphasize her frustration with the underpayment and underappreciation of her role.  (TSY 12 ("This is a joke.  We are teachers, counselors, social workers, baby-sitters, parents, friends, referees all at the same time … one salary though … and they give us fruit snacks?")).  In *Abbott Elementary*, on the other hand, the line is delivered not by the protagonist, but instead by Beeman, a more experienced teacher, to comfort the protagonist's disappointment, and remind her that the reason why each teacher is still in the job is "[s]ure as hell not the pay."  (AE 29 ("[T]eachers at a school like [Abbott] have to be able to do it all.  We're admin.  We're therapists.  We're social workers.  We're second parents.  Sometimes, first.  Why?  Sure as hell not the pay.")).  This is emphasized by Peterson's further observation, that "[they] do this because [they're] supposed to.  It's a calling."  (*Id.*).

Finally, in comedies that incorporate the racial dynamics of inner-city public schools into their narrative, a white character "who attempt[s] to belong within the dominant [B]lack culture of the school" (SAC, Ex. E ¶ 13; *see also id.* ¶ 18 (observing both works "use African American slang as a prominent plot/character device")), is, without more, a stock similarity based on non-protectible generalized traits.  *See Abdin*, 971 F.3d at 67 ("[G]eneric and generalized character traits such as race, gender, and hair color are not protectible."); *cf. Marcus* v. *ABC Signature Studios, Inc.*, 279 F. Supp. 3d 1056, 1066 (C.D. Cal. 2017) (dismissing copyright claim where "[t]he only similarity [in both television shows] is the idea of 'acting black,'" and finding the relevant

43

vignettes to be "scènes-à-faire ... flow[ing] necessarily or naturally from the basic plot premise of a black family living and working in a predominantly white area" (internal quotation marks omitted) (citing *Cavalier*, 297 F.3d at 822)); *Ricketts* v. *CBS Corps.*, 439 F. Supp. 3d 1199, 1214 (C.D. Cal. 2020) (finding television series' "theme of the 'fish-out-of-water,' [] is not protectable and arises naturally from the premise of a poor, young, black man attending a school with rich, mostly white students").  Nor is Plaintiff correct in her bare assertion that "[b]oth works have Black Nationalist characters," as specific references to the concept of Black Nationalism are nowhere to be found in either work.  (SAC, Ex. E ¶ 21).  At best, both works contain a scene in which a character "raise[s] [a] fist in black solidarity."  (*Id.*).  Plaintiff's claim, however, cannot stand on the single gesture alone, as the gesture appears in different contexts and is made by different types of characters, consistent with the fact that a raised fist in protest is a well-recognized gesture of solidarity that rises naturally from the broader unprotectible theme of race and Black culture in both works.  Accordingly, Plaintiff's allegations fall well short of the mark required to show character infringement with respect to both the protagonists and the supporting characters of each work.

### iii.    Minor Similarities in Setting, Format, and Pace Cannot Support Plaintiff's Claim of Infringement

As discussed above, almost the entirety of Plaintiff's specified areas of similarity arises in the context of the plot and characters of each work.  With respect to the remaining factors — setting, format, and pace — the Court finds no substantial similarities upon which Plaintiff can rest her claim.

*First*, Plaintiff provides no specific indications of how Abbott Elementary School, located in Philadelphia, is similar to New York City P.S. 311 in *This School Year*, beyond those commonalities consistent with an archetypal inner-city public-school environment.  *See Burnett*, 204 F. Supp. at 331-32 (finding that the common "vocational school background" of both works was an unprotectable general setting).

*Second*, while both works are shot in a mockumentary format, this narrative technique on its own is insufficiently unique to serve as a protectable similarity, as "copyright does not protect styles, but only particular original expressions of those styles."  *McDonald* v. *West*, 138 F. Supp. 3d 448, 455 (S.D.N.Y. 2015) (citing *Judith Ripka Designs, Ltd.* v. *Preville*, 935 F. Supp. 237, 248 (S.D.N.Y. 1996)).  Indeed, and notwithstanding Plaintiff's conclusory argument to the contrary (SAC, Ex. E ¶ 8), the mockumentary format is a well-known narrative mechanism for television workplace comedies, as utilized in long-running and critically-acclaimed programs such as *The Office*, *Parks & Recreation*, and *Modern Family*, *inter alia*.[12]  "To hold that the use of such [a narrative device] is copyrightable would be to deprive this unique genre of vehicles necessary to advance the plot, effectively preventing others from penning similar stories."  *Mena* v. *Fox Entm't Grp., Inc.*, No. 11 Civ. 5501 (BSJ) (RLE), 2012 WL 4741389, at *8 (S.D.N.Y. Sept. 29, 2012); *cf. Tanksley* v.

---

[12]    As before, the Court may take judicial notice of the mockumentary format, popularity, and series length of each television series, as these facts are both generally known within the Court's territorial jurisdiction, and capable of accurate and ready determination by resort to accurate sources.  *See* Fed. R. Evid. 201.

*Daniels*, 259 F. Supp. 3d 271, 288 (E.D. Pa. 2017) (observing that narrative use of "flashback scenes [is] not protected[;] [t]hey are commonly used devices in a soap opera style story, and have been used countless times in television shows and movies" (citing *Herzog* v. *Castle Rock Ent'mt*, 193 F.3d 1241, 1260-61 (11th Cir. 1999) (observing that the stylistic "use of flashbacks … is a familiar device in film and fiction" and cannot, without more, support a finding of substantial similarity))), *aff'd*, 902 F.3d 165 (3d Cir. 2018).  Similarly, the fact that the principal in both works made the decision to hire the camera crew flows naturally from the elementary school setting, where the principal generally serves as the highest decisionmaking authority in the workplace, and whose approval would be necessary to bring a hypothetical film crew into the school.

Finally, Plaintiff does not identify specific similarities in the pace of the two works, beyond her general argument that the "format and pace of the works are identical."  (Pl. Abbott Opp. 14).  Regardless, "pace, without more, does not create an issue of overall substantial similarity between the works." *Williams*, 84 F.3d at 590.

Ultimately, none of Plaintiff's complained-of similarities is borne out by the Court's close review of the works themselves.  After having extracted and evaluated the protectible elements of both works, the Court finds that "points of dissimilarity exceed those that are similar," and that any coincidental similarities "are — when compared to the original work — of small import quantitatively [and] qualitatively."  *Rogers*, 960 F.2d at 308.  Accordingly, "a finding of no infringement is appropriate."  *Id.*; *see also Durham Indus., Inc.* v.

*Tomy Corp.*, 630 F.2d 905, 913 (2d Cir. 1980) ("Numerous differences tend to undercut substantial similarity.").

> **b.    The Total Concept and Overall Feel of the Works Are Appreciably Different**

Finally, the difference between the two works is even more notable when viewing them through a wider lens.  While Plaintiff is correct that "a work may be copyrightable even though it is entirely a compilation of unprotectable elements" (Pl. Abbott Opp. 7 (quoting *Wolstenholme* v. *Hirst*, 271 F. Supp. 3d 625, 635 (S.D.N.Y. 2017))), she fails to demonstrate that such overall similarity is present here.

Indeed, and as demonstrated by the Court's analysis of each of Plaintiff's alleged similarities, the two works use qualitatively different plots, themes, and characters to cast different perspectives on the experiences of teachers in under-resourced, inner-city public-school settings.  *This School Year* blends comedy with a harder-edged look at the uncertainties and challenges teachers face, with Ms. Davis's pragmatic goal of securing tenure as a key example. *Abbott Elementary*, on the other hand, employs a comparatively lighter tone, utilizing Ms. Teagues's comedic naïveté and persistent optimism to emphasize the resource constraints and other limitations faced by teachers working in such settings.  Ultimately, any discerning observer would appreciate that Plaintiff and Defendants "selected, coordinated, and arranged the elements of [each] work," in a distinct manner, belying any plausible finding of substantial similarity with respect to the total concept and feel of each work.  *Knitwaves*,

71 F.3d at 1004 (internal quotation marks omitted) (citing *Feist*, 499 U.S. at 358).

Altogether, therefore, Plaintiff has failed to plausibly establish "the substantial similarity of protectible material in the two works," *Williams*, 84 F.3d at 587, which similarity is a necessary element to establish that Defendants engaged in any "copying of constituent elements of [Plaintiff's] work that are original," *Abdin*, 971 F.3d at 66.  Absent this essential element, Plaintiff's copyright claim must be dismissed.

### C.    Plaintiff Cannot Establish Claims Against Parks or the BPP Defendants for Contributory Infringement

As the Court has found that Plaintiff cannot prevail in her claims of direct infringement against the Abbott Defendants, any hypothetical claims for contributory infringement against Parks or the BPP Defendants must also fail. *See Williams* v. *A & E Television Networks*, 122 F. Supp. 3d 157, 165 (S.D.N.Y. 2015) ("[T]here can be no contributory infringement absent actual infringement." (citing *Faulkner* v. *Nat'l Geographic Enters., Inc.*, 409 F.3d 26, 40 (2d Cir. 2005))).  Accordingly, the Court need not reach the BPP Park Defendants' arguments that Plaintiff engaged in impermissible "shotgun pleading" with respect to her allegations against them.  (BPP Br. 6-7).

### CONCLUSION

For the foregoing reasons, Parks's and the BPP Defendants' motions to dismiss the SAC for lack of personal jurisdiction are DENIED without prejudice.  Defendants' broader set of motions to dismiss the SAC for failure to state a claim are hereby GRANTED.

The Clerk of Court is directed to terminate all pending motions, including those at docket entries 64, 68, and 86, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      March 19, 2024
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge